IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA


| | |
|---|---|
| BARBARA H. TALBERT, ) | |
| ) | |
| ) | CIVIL ACTION NO. 0:06-3231-TLW-BM |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of the final decision of the Commissioner wherein she was denied disability benefits.

This case was referred to the undersigned for a report and recommendation pursuant to Local Rule

73.02(B)(2)(a), (D.S.C.).

Plaintiff applied for Disability Insurance Benefits (DIB) and Supplemental Security

Income (SSI) in September 2003, alleging disability as of April 21, 2003 due to back and leg pain,

high blood pressure and obesity. (R.pp. 86-88, 95, 249-251). Plaintiff's claims were denied initially

and upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge

(ALJ), which was held on March 6, 2006. (R.pp. 28-66). The ALJ thereafter denied Plaintiff's claims

in a decision issued July 19, 2006. (R.pp. 13-21). The Appeals Council denied Plaintiff's request for

a review of the decision, thereby making the determination of the ALJ the final decision of the



Commissioner. (R.pp. 5-7).

The Plaintiff then filed this action in United States District Court. Plaintiff asserts that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded for an award of benefits. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that the Plaintiff was properly found not to be disabled.

### Scope of review

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990); <u>Richardson v. Califano</u>, 574 F.2d 802, 803 (4th Cir. 1978); <u>Myers v. Califano</u>, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

<u>Hays</u>, 907 F.2d at 1456 (citing <u>Laws v. Celebrezze</u>, 368 F.2d 640 (4th Cir. 1966)). The Court lacks the authority to substitute its own judgment for that of the Commissioner. <u>Laws</u>, 368 F.2d at 642. "[T]he language of [405(g)] precludes a de novo judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by substantial evidence." <u>Blalock v. Richardson</u>, 483 F.2d 773, 775 (4th Cir. 1972).



## Discussion

A review of the record shows that Plaintiff, who was forty-six (46) years old when she alleges her disability began, has one year of college education with past relevant work experience as a textile packer. (R.pp. 62-63, 86, 95). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that she has an impairment or combination of impairments which prevent her from engaging in all substantial gainful activity for which she is qualified by her age, education, experience and functional capacity, and which has lasted or could reasonably be expected to last for at least twelve (12) consecutive months. After a review of the evidence and testimony in the case, the ALJ determined that, although Plaintiff does suffer from severe impairments and could no longer perform her past relevant work (classified as "medium"[1] in nature), she nevertheless retained the residual functional capacity to perform a restricted range of light work[2], and was therefore not disabled. (R.pp. 16, 20-21, 62-63).

Plaintiff asserts that in reaching this decision, the ALJ erred by failing to assign "great weight" to the opinion of Plaintiff's treating physician, Dr. Coleman King; by failing to properly assess Plaintiff's severe, chronic pain; and by improperly considering and analyzing the evidence in the case. However, after careful review and consideration of the evidence and arguments presented, the undersigned finds that there is substantial evidence in the record to support the conclusion of the ALJ that Plaintiff was not disabled as that term is defined in the Social Security Act during the

---

[1]"Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).

[2]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b) (2005).

3



relevant time period, and that the decision of the Commissioner should therefore be affirmed.

The ALJ found in his decision that Plaintiff suffers from lower back pain and obesity, and that these were "severe" impairments under the Social Security Act. 20 C.F.R. § 404.1521(a) [an impairment is severe when it is more than a slight abnormality that has more than a minimal effect on the ability to do basic work activities]. This finding does not, however, by itself mean that Plaintiff is entitled to DIB or SSI. See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) [the mere presence of impairments does not automatically entitle a claimant to disability benefits, there must be a showing of related functional loss]. Rather, in order to obtain benefits, the evidence must show that these impairments are of a disabling severity. Trenary v. Bowen, 898 F.2d 1361, 1364 (8th Cir. 1990) [Courts should properly focus not on a claimant's diagnosis, but on the claimant's actual function limitations]. The ALJ determined that Plaintiff's impairments, although severe, were not of a disabling severity, and the record contains substantial evidence to support this finding.

## I.

First, although Plaintiff asserts in her disability filing that she ceased working in April 2003 because she could no longer bear the leg and back pain she was experiencing at work; see (R.pp. 41-42, 95); Plaintiff's medical records reflect that the only medical treatment she sought and received at the time she stopped working was for alcohol abuse. (R.pp. 142-146, 228-238). Plaintiff did not go to see Dr. King complaining of back pain until August 2003, which was four months *after* she had stopped working. (R.pp. 175-176). See Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994) [failure to seek medical treatment may support a finding that a claimant's impairments are not of disabling severity]. Plaintiff complained to Dr. King of pain radiating into both legs and numbness in her toes, and on examination Plaintiff exhibited discomfort when performing straight leg raising



with a diminished patellar reflex on the left. However, Plaintiff's back was found to have no tenderness and no abnormal curve, and her leg strength was found to be normal. Dr. King prescribed Plaintiff some medication and ordered an EMG and MRI. (R.p. 176). The MRI was performed the following week,[3] revealing severe facet arthropathy and ligamentum flabum hypertrophy at L5-S1, creating a bony narrowing of the foramina impinging on the exiting nerve roots on the left greater than the right, as well as broad based bulging at L4-5 with increased synovial fluid within the facet joints consistent with mild instability. Nerve roots at that level were not impinged. (R.p. 174).

Plaintiff returned to see Dr. King on September 5, 2003, again advising him that she had quit working at her job in April because of back and leg pain. While Dr. King discussed Plaintiff's MRI results with her, he did not perform another examination on that date. Dr. King's treatment notes indicate that he discussed the possibility of surgical treatment, but that although Plaintiff was willing to talk to a surgeon, she did not want to have any surgery. Plaintiff was prescribed some medications and referred to a neurosurgeon and to a pain management clinic, and was to return to see Dr. King for a follow-up in three months. (R.p. 172). However, Plaintiff did not return to see Dr. King again until April 22, 2004. (R.pp. 169-170).

In the interim, Plaintiff had a consultative examination performed on February 17, 2004 by Dr. Eugene McManus. Dr. McManus noted that Plaintiff was 5'1" and weighed 184 lbs., exhibited a "considerable amount of pain regardless of what position she assumes," and that she complained of "constant" pain. Plaintiff also complained of acid reflux, angina, and hypertension, for which she was on medication. She advised Dr. McManus that she did her own cooking and cleaning, drove, and managed her own finances, although she did not perform any yard work. On

---

[3]No EMG was ever performed. (R.p. 172).



examination Plaintiff complained of pain on palpation anywhere over the perispinous muscles. While in the supine position Plaintiff was tested for straight leg raising, which was 25% of normal on both the left and the right. However, when Plaintiff was subsequently tested in the upright position, it was about 40% bilaterally. Plaintiff exhibited "exquisite pain" when flexing her right hip, although her spine appeared perfectly straight and her upper extremities appeared to be normal bilaterally. As for her lower extremities, strength of flexion and extension and knee mobility were only 50% of normal bilaterally and only 25% - 30% of normal in extension bilaterally. She could not bend at the waist in an effort to touch her toes nor could she squat. Dr. McManus diagnosed severe back pain, radiculopathy and neuropathy secondary to this pain, hypertension (by history), recurrent angina (by history), and acid reflux. (R.pp. 158-161).

A few days later, Plaintiff was seen by Dr. W.H. Morgan, a family physician, who noted that Plaintiff was seeing Dr. King for her complaints of back pain but that she did not want surgery for this pain. Plaintiff was referred to a pain management program. (R.p. 165).

On March 5, 2004, Dr. Frank Ferrell reviewed Plaintiff's medical records and completed a physical residual functional capacity assessment. Dr. Ferrell opined that Plaintiff could perform light work that would only occasionally require climbing, kneeling, or crouching with avoidance of concentrated exposure to hazards such as machinery and heights. He assigned Plaintiff no other limitations, specifically finding that Plaintiff's hypertension and obesity were not severe impairments. (R.pp. 196-203).

Plaintiff thereafter returned to see Dr. King on April 22, 2004, who noted that Plaintiff had "missed several appointments" since he had last seen her. Plaintiff again complained of low back pain radiating into both legs, and was found on examination to weigh 179.2 lbs., placing her at



"mildly overweight". Plaintiff was found to have no leg edema, no abnormal curvature, and no tenderness on palpation over her spine or back muscles, with positive straight leg raising causing low back discomfort. Dr. King continued to diagnose Plaintiff with chronic low back pain and again referred Plaintiff for pain management.[4] (R.pp. 169-171).

On May 5, 2004, Plaintiff was seen by Dr. Norman Chutkan, an orthopedist, on referral from Dr. King. Plaintiff reported to Dr. Chutkan that her pain had been present for "somewhere between five and ten years", that she had "significant mechanical back pain, as well as bilateral leg pain, left greater than the right..." and that the "pain seems to be worse with standing, sitting, walking, any types of activities." Plaintiff further reported that she took Motrin for her pain, but that while she also had a prescription for Percocet, she had not filled it. (R.p. 223). Plaintiff also reported to Dr. Chutkan that her social history was "negative for alcohol and tobacco use," notwithstanding her previous alcohol treatment. On physical examination, Plaintiff was found to be "healthy -appearing" and "somewhat overweight". Plaintiff exhibited limited range of motion in all plains secondary to pain and exhibited defuse tenderness to palpation of the lower lumbar spine. Dr. Chutkan noted that Plaintiff exhibited pain with just about all movements, although static testing revealed normal strength bilaterally with intact reflex and sensation. She also had a mildly positive straight leg raise bilaterally. Dr. Chutkan opined that Plaintiff was suffering from significant mechanical back pain due to her degenerative disc disease and facet arthropathy, as well as the component of radiculopathy from the facet hypertrophy and foraminal stenosis. However, despite her complaints of constant pain, Plaintiff indicated that she was not interested in pursuing any type of surgical intervention, which Dr. Chutkan thought was "probably not a bad idea [ ] give[en] the fact

---

[4]Plaintiff did not show up for her pain management appointment. (R.p. 171).



that she has not had any other conservative measures initiated." Plaintiff was also reluctant to engage in any pain management program at a pain clinic, although she indicated that she might "be willing to try this....". (R.p. 224). <u>See</u>   <u>Robinson v. Sullivan</u>, 956 F.2d 836, 840 (8th Cir. 1992) [conservative treatment not consistent with allegations of disability]; <u>Mickles</u>, 29 F.3d at 921 [failure to seek medical treatment may support a finding that a claimant's impairments are not of disabling severity].

Plaintiff was thereafter seen at the pain clinic by Dr. Ines Berger, who noted that Plaintiff was currently using only a "low-dose pain regimen....". Dr. Berger recommended physical therapy, referral to a pain psychologist, a trial of epidural steroid injections as well as lumbar facet injections, with a specified drug regimen. However, Plaintiff stated that she was not interested in proceeding with any type of injection, nor with a referral to a pain psychologist. With respect to the remainder of Dr. Berger's recommendation, Plaintiff indicated that she wished to "discuss these recommendations with her primary care physician first." (R.pp. 226-227).

Plaintiff was then referred by Dr. Morgan to Dr. Todd Cable, a neurologist, who saw the Plaintiff on May 13, 2004. Dr. Cable noted that Plaintiff had rejected offered injections in her lumbar spine, and had left the pain clinic following her evaluation on May 9, 2004 "apparently reportedly without [a] follow-up visit being scheduled....". On physical examination, Plaintiff was found to be "moderately obese"with an "[e]xaggerated lordosis[5] when standing secondary to distribution of body weight." Plaintiff complained of pain when asked to perform a variety of body movements, but was found to have 5/5 motor strength bilaterally in both her upper and lower extremities. Dr. Cable assessed Plaintiff with bilateral radicular pain, lumbar spondylosis, a potential

---

[5]Abnormally exaggerated curvature of the spine.

8



for discogenic[6] low back pain, with moderate obesity.   Plaintiff was offered transforaminal epidural steroid injections for her pain, but she declined.  (R.pp. 177-179).  Plaintiff did, however, on Dr. Cable's referral, participate in same physical therapy sessions at the Walton Rehabilitation Hospital in May, June and July 2004.  (R.pp. 209-219).

Plaintiff was seen by another neurosurgeon, Dr. Dominic Cannella, on June 7, 2004. Plaintiff complained to Dr. Cannella that her back hurt "every single day all the time", describing low back pain with  radiation to both buttocks, both lateral thighs, and both lateral calves, the left more so than the right.  On physical examination, Plaintiff was found to be "somewhat overweight" but in no distress and able to sit comfortably in the office. She had no paraesthesias or weakness in either leg, and exhibited good cervical and thoracic range of motion, although her lumbar range of motion was decreased and resulted in low back pain.  No motor or sensory loss was noted, deep tendon reflexes were 1+ at the biceps, triceps and ankles bilaterally, and deep tendon reflexes were 1-2+ at the right knee and 1- at the left knee.  Dr. Cannella found no evidence of myelopathy, but there was a suggestion of a left L3-4 radiculopathy as evidenced by a diminished left knee jerk.  He also noted that x-rays of Plaintiff's lumbar spine on May 13, 2004 showed "some degree of movement and subluxation of L4 on L5".  He assessed Plaintiff with low back and bilateral leg pain, left greater than right secondary to lumbar spondylolisthesis of L4 on L5 with a suggestion of lumbar instability, and that her neurological examination also suggested a possible left L3-4 radiculopathy.  Plaintiff was prescribed some medication, and was referred for an MRI scan of her lumbar spine as well as x-rays of her pelvis and hips.  She was to return after these procedures were completed for reevaluation.

---

[6]Pain deriving from an intervertebral disc source.



(R.pp. 220-221).  However, there is no indication in the records that Plaintiff ever returned to see Dr. Cannella.

On June 8, 2004, Plaintiff's medical records were reviewed by Dr. W.B. Hopkins, who completed a physical residual functional capacity assessment finding that Plaintiff could perform light work that only occasionally required her to climb ramps and stairs, balance, stoop, kneel, crouch, or crawl, and never required her to climb ladders, ropes or scaffolds, with avoidance of even moderate exposure to hazards such as machinery and heights.  Dr. Hopkins found no other limitations.  (R.pp. 184-191).  He also found that Plaintiff's hypertension and obesity were not severe impairments.  (R.p. 182).

On August 12, 2004, Plaintiff returned to see Dr. King and obtain more prescriptions. Plaintiff was also noted to have some skin problems, but when Dr. King discussed possible medicine changes or referrals, Plaintiff indicated she wanted to wait and talk to Dr. Randy Watson.  (R.pp. 245-246).  Plaintiff thereafter saw Dr. Watson, apparently a general practitioner, off and on through August 2006, from whom she received medications for pain as well as medications for other complaints.  (R.pp. 239-243, 257-259).

On February 7, 2006, Plaintiff returned to see Dr. King for the first time in almost a year and a half.  Plaintiff was seeking a prescription for pain. With respect to Plaintiff's referrals for pain management in 2004, Plaintiff complained to Dr. King that Dr. Berger had "wanted to put [her] on the Psych ward".  Although Plaintiff was not formally examined on that visit, Dr. King continued to assess Plaintiff with chronic low back pain. (R.p. 244).  The following month, Dr. King completed a clinical assessment of pain form in which he opined that Plaintiff's pain was "profound and intractable;  that virtually incapacitate's this individual", and that pain would "remain a significant



element in this individual's life" in the future.  However, when asked to what extent physical activities such as walking, standing, bending, stooping, or moving of extremities would increase the degree of pain experienced by the Plaintiff, Dr. King wrote "unknown"; and when asked to what extent medications could be expected to affect the Plaintiff, Dr. King indicated that "some side effects can be expected, but will be only mildly troublesome."  When asked to what extent Plaintiff's pain and/or prescribed medications would effect her ability to perform her previous work activities, Dr. King did not pick one of the typed alternatives, but instead wrote in the margin "disabled - not working".  Finally, when asked to what extent treatments for pain have served to lessen the degree of pain in individuals with pain levels such as those experienced by the Plaintiff, Dr. King again wrote "unknown".  (R.pp. 247-248).

## II.

After reviewing this medical evidence and considering Plaintiff's subjective testimony, the ALJ found that Plaintiff had the residual functional capacity for light work restricted to only occasional stooping, twisting, crouching, kneeling and climbing stairs or ramps; never climbing ladders or scaffolds; and never being exposed to hazards such as heights or dangerous machinery. (R.p. 16).  In reaching these conclusions, the ALJ did not find the March 14, 2006 opinion of Dr. King as set forth in the aforementioned "clinical assessment of pain" form to be supported by objective clinical findings or otherwise persuasive in evaluating Plaintiff's disability, noting first that Dr. King had not answered several questions on the form other than to write "unknown", that the questions he did answer appeared to be based on Plaintiff's own reports and statements to him, not objective clinical findings of his own or any other physician, and that at the time Dr. King completed the form he had not seen the Plaintiff at all for about a year and a half prior



to that time. (R.p. 19). <u>See</u> <u>Mastro v. Apfel</u>, 270 F.3d 171, 178 (4th Cir. 2001) [Physician's opinion not entitled to controlling weight where it "was communicated a year after his last treatment [of the claimant]"]; <u>Craig v. Chater</u>, 76 F.3d 585, 590, n. 2 (4th Cir. 1996) ["There is nothing objective about a doctor saying, without more, 'I observed my patient telling me she was in pain'"]. The ALJ was not required to accept Dr. King's March 2006 opinion when that opinion was rendered almost a year and a half after he had last examined the Plaintiff, was primarily based on Plaintiff's own subjective report as to the severity of her symptoms, and was not generally supported by either Dr. King's own prior objective medical records or the other objective medical evidence. <u>See</u> <u>Craig</u>, 76 F.3d at 589-590 [rejection of treating physician's opinion justified where the treating physician's opinion was inconsistent with substantial evidence of record].

        In rejecting this opinion, the ALJ found that the objective findings and treatment notes of Plaintiff's treating and examining physicians were consistent with the residual functional capacity limitations described above, and that the opinions of the state agency medical consultants were also consistent with this residual functional capacity. (R.pp. 19-20). The undersigned can find no reversible error in the ALJ's treatment of these opinions and the medical record, as the records of Plaintiff's treating and examining physicians, while certainly confirming the existence of degenerative disc disease, consistently reflect that Plaintiff received only conservative treatment for her condition, that she had 5/5 strength in her extremities with no edema, no abnormal curvature, and only moderate obesity. <u>See</u> <u>Robinson</u>, 956 F.2d at 840 [conservative treatment not consistent with allegations of disability]; <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1186 (8th Cir. 1989) ["The mere fact that working may cause pain or discomfort does not mandate a finding of disability"]; <u>Melton v. Apfel</u>, 181 F.3d 939, 942 (8th Cir. 1999) [lack of medically necessary restrictions supported the ALJ's



non-disability findings]; <u>Gross</u>, 785 F.2d at 1166 [the mere presence of impairments does not automatically entitle a claimant to disability benefits, there must be a showing of related functional loss]. The records and opinions of Plaintiff's treating and examining physicians discussed hereinabove provide substantial evidence to support the residual functional capacity found by the ALJ; <u>see</u> <u>Hunter v. Sullivan</u>, 993 F.2d 31, 35 (4th Cir. 1993) [ALJ may properly give significant weight to an assessment of an examining physician]; <u>Richardson v. Perales</u>, 402 U.S. 389, 408 (1971) [assessment of examining, non-treating physicians may constitute substantial evidence in support of a finding of non-disability]; as do the opinions of the state agency physicians. <u>Smith v. Schweiker</u>, 795 F.2d 343, 345 (4th Cir. 1986) [opinion of a non-examining physician can constitute substantial evidence to support the decision of the Commissioner]; <u>Johnson v. Barnhart</u>, 434 F.3d 650, 657 (4th Cir. 2005) [ALJ can give great weight to opinion of medical expert who has thoroughly reviewed the record]; <u>see</u> SSR 96-6p [Agency physicians are experts in the evaluation of medical issues for purposes of disability claims].

        Hence, notwithstanding Dr. King's march 2006 statement, the ALJ properly exercised his authority in reviewing and evaluating all of the evidence in making his decision. <u>Hays</u>, 907 F.2d at 1456 [it is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence]; <u>see</u> <u>Johnson v. Barnhart</u>, 434 F.3d 650, 657 (4th Cir. 2005) [ALJ properly rejected physician's opinion that was based on the claimant's own subjective complaints]; <u>Castellano v. Secretary of Health & Human Servs.</u>, 26 F.3d 1027, 1029 (10th Cir. 1994) [physician opinion that a claimant is totally disabled "is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]"].



## III.

As for the ALJ's evaluation of the evidence of chronic pain and Plaintiff's subjective testimony, the decision reflects that the ALJ thoroughly reviewed the medical evidence, Plaintiff's own statements as to her condition, as well as the inconsistencies in Plaintiff's allegations and the extent of her daily activities when compared with the objective medical evidence to find that Plaintiff's description of the severity of her limitations was not totally credible.    The ALJ took particular note of the limited clinical findings to support Plaintiff's alleged symptoms, her inconsistent stories as to why she quit working as opposed to the objective records reflecting different facts, her refusal to undergo anything other than conservative treatment for her condition, and her sporadic attendance at scheduled medical appointments. (R.p. 19).

The undersigned can find no reversible error in the ALJ's treatment of  Plaintiff's subjective testimony in conjunction with the objective medical evidence of record, nor do I find that the ALJ failed to consider all of Plaintiff's impairments or conducted a flawed credibility or pain analysis. See Hunter  993 F.2d at 35 [ALJ may properly consider inconsistencies between a plaintiff's testimony and the other evidence of record in evaluating the credibility of the plaintiff's subjective complaints]; Jolley v. Weinberger,  537 F.2d 1179, 1181 (4th Cir. 1976) [finding that objective medical evidence, as opposed to the claimant's subjective complaints, supported an inference that he was not disabled]; Mickles, 29 F.3d 918, 925-926 (4th Cir. 1994) [In assessing the credibility of the severity of reported subjective complaints, consideration must be given to the entire record, including the objective and subjective evidence]. Further, the record in this case supports the ALJ's findings and conclusions.  Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964) [court scrutinizes the record as a whole to determine whether the conclusions reached are rational]; Gross,



785 F.2d at 1166 [the mere presence of impairments does not automatically entitle a claimant to disability benefits, there must be a showing of related functional loss]; see Mickles, 29 F.3d at 921 [failure to seek medical treatment may support a finding that a claimant's impairments are not of disabling severity]; Robinson, 956 F.2d at 840 [conservative treatment not consistent with allegations of disability]

## IV.

Finally, Plaintiff's complaint that the hypothetical posed to the vocational expert at the hearing was improper and did not accurately reflect Plaintiff's true RFC is without merit. The record shows that the ALJ obtained vocational expert testimony at the hearing, where the vocational expert was proffered a hypothetical which reflected the residual functional capacity found to exist by the ALJ. (R.p. 63). In response to this hypothetical, the VE identified several unskilled light jobs which Plaintiff could perform with her limitations. (R.p. 63). While Plaintiff may disagree with the findings of the ALJ, the undersigned has previously concluded that these findings are supported by substantial evidence in the record as that term is defined in the applicable caselaw. Hence, the hypothetical given by the ALJ to the vocational expert was proper, and the undersigned finds no grounds in the ALJ's treatment of the vocational expert's testimony for reversal of the final decision of the Commissioner. Lee v. Sullivan, 945 F.2d 687, 694 (4th Cir. 1991); see also Martinez v. Heckler, 807 F.2d 771, 773 (9th Cir. 1986).

## Conclusion

Substantial evidence is defined as " ... evidence which a reasoning mind would accept as sufficient to support a particular conclusion." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). As previously noted, if the record contains substantial evidence to support the decision (i.e.,



if there is sufficient evidence to justify a refusal to direct a verdict were the case before a jury), this

Court is required to uphold the decision, even should the Court disagree with the decision. <u>Blalock</u>,

483 F.2d at 775.

        Under this standard, the record contains substantial evidence to support the conclusion

of the Commissioner that the Plaintiff was not disabled within the meaning of the Social Security Act

during the relevant time period. Therefore, it is recommended that the decision of the Commissioner

be **affirmed**.

_____

Bristow Marchant
United States Magistrate Judge

Columbia, South Carolina

December 17, 2007

16

